## Turner et al. v. McCarty et al.
Jan. 24, 1939.

482

C. R. LUKER for appellants.

H. C. CLAY for appellees.

OPINION OF THE COURT BY JUDGE REES—Affirming.

This is an action to quiet title to 4 1/5 acres of land.

Prior to October, 1934, appellants and appellees had been friends and neighbors in Tennessee. On October 22, 1934, appellee Carl McCarty and his father, J. L. McCarty, purchased from F. C. Brock and wife 90 acres of land in Laurel county. Twenty-five acres were conveyed to Carl McCarty and 65 acres to J. L. McCarty. The 25-acre tract conveyed to appellee adjoined a tract of land owned by Lillie Hensley. This adjoining tract of land was conveyed on October 26, 1934, by Lillie Hensley and husband to appellants, Robert Turner and his wife, Emma Turner. At the time a wire fence separated the land purchased by appellants from the land that had been conveyed to Carl McCarty by F. C. Brock and wife. The wire fence was recognized by the parties as the division line until sometime in 1936, when the appellants had their land surveyed. The lines run by the surveyor crossed the wire fence onto the land claimed by McCarty, and included 4 1/5 acres west of the fence. The appellants then entered upon the land in dispute, and began cutting timber, whereupon appellees brought this action on February 17, 1937, to quiet their title to the land and to enjoin appellants from entering thereon and from cutting and removing timber therefrom. In an answer and counterclaim the appellants denied that appellees were the owners of the land, alleged ownership in themselves, and asked to have their title quieted. In a reply filed by appellees, it was alleged that more than fifteen years before the institution of this action the land claimed by appellants was claimed by W. M. Elliott and his brother, Elmer Elliott, jointly, and the lands now claimed by appellees were claimed by F. C.

Brock, and that the appellants were claiming title through and under the Elliotts and appellees were claiming title through and under Brock; that there was a controversy between Brock and the Elliotts as to the true location of the line, and, in order to settle the dispute and for the purpose of establishing the line without the expense of a survey, it was mutually agreed by and between the Elliotts and Brock that the line between the two tracts of land owned by them should be located by beginning at a spotted oak at W. M. Elliott's corner and running a straight line with the fence then on the land as far as it extended, and from the end of the fence a straight line to a red oak and sourwood in McHargue's line; that pursuant to this agreement the parties thereto immediately thereafter erected a division fence along this line, and thereafter the respective owners of these lands recognized this line as the true line between the two tracts of land; and that each party held actual possession of the land up to the division fence, which was erected more than fifteen years prior to the institution of this action. In a rejoinder, appellants admitted that they claimed title under the Elliotts, who were parties to the agreement, and that appellees claimed under F. C. Brock, but denied that such an agreement was made or that the line where the fence was located was ever recognized as a division line between the two tracts of land.

A stipulation providing that certain deeds, under which the respective parties claimed title, should be considered without being copied into the record was filed. This stipulation concluded:

"The only question to be considered in this action is the location of the line between the lands of the plaintiffs and the lands of the defendants, the effect of the agreement between the former owners of these respective tracts of land, the questions of adverse possession, and champerty."

A great number of depositions were taken, and upon submission of the case, the court adjudged that the plaintiffs, Carl McCarty and Elizabeth McCarty, were the owners of and in the actual possession of the lands described in the petition, and their title thereto was quieted against all claims of the defendants and all persons claiming title thereto under them, and the defendants were enjoined from entering upon the land in con-

troverSy or any part thereof and from cutting or removing any timber therefrom.

F. C. Brock testified that in 1920 he owned the land now claimed by appellees, and that Elmer Elliott and W. M. Elliott owned the adjoining land now claimed by appellants. A woven wire fence extended from a point in the county road about two-thirds of the distance to the McHargue line, and was the division fence between the two tracts of land. It had been built many years before where an old rail fence had been located. He desired to extend this division fence to the McHargue line, and, being of the opinion that W. M. Elliott and Elmer Elliott, owners of the adjoining land, should bear half of the expenses, he entered into negotiations with them. There was some dispute between the Elliotts and Brock as to the correct location of the line from the end of the woven wire fence to the McHargue line, but they finally agreed on a corner in the McHargue line and that a barbed wire fence should be extended from the end of the woven wire fence to this corner. The Elliotts paid one-half of the cost of the wire and furnished one-half of the labor to erect the fence. Brock testified that he and the Elliotts agreed that this should be the division line between the two tracts of land, and that it was so recognized by the respective owners thereafter until this litigation arose. W. M. Elliott died before this case was tried, but Elmer Elliott was introduced as a witness by appellants. He admitted that he and his brother, in the spring of 1921, assisted F. C. Brock in erecting the barbed wire fence, and paid one-half of the expenses. He stated that none of the parties knew exactly where the division line was located. He did not remember that any agreement was entered into fixing the location of the barbed wire fence as the division line, but he admitted that he and his brother never claimed any land beyond the fence thereafter. There was also proof that this fence was pointed out to appellants before they purchased the land from the Hensleys, and they were told that it was on the boundary line.

It would serve no useful purpose to repeat in detail the evidence pro and con, but it is sufficient to say that the preponderance of the evidence supports the judgment, and shows that not only an agreement was made in the spring of 1921 between the owners of the respective tracts of land fixing the division line, but that the fence

now between the two tracts has been recognized as the division fence for more than fifteen years, and that during all of that time the owners of the tract on the west side of the fence have been in the actual possession of the land up to the fence, including the land in controversy, claiming it as their own. There was proof that the dividing line between the two tracts was uncertain, and that at the time the barbed wire fence was erected there was a bona fide dispute between the owners of the adjoining lands as to its location. The owners of the two tracts agreed upon a line and jointly erected a fence thereon. The land had little value, and the parties adopted a fair and reasonable method to solve the difficulty. Such oral agreements followed by acquiescence, though for less than fifteen years, are binding on the parties. In Garvin v. Threlkeld, 173 Ky. 262, 190 S. W. 1092, it was said [page 1093]:

> "While the validity of parol agreements to settle disputed boundaries was long resisted on the ground that, in effect, they passed the title to real property without the solemnities required by the statute, it is now settled that, where the dividing line is uncertain and there is a bona fide dispute as to its location and the parties agree on the dividing line and execute the agreement by marking the line or building a fence thereon, such an agreement is not prohibited by the statute of frauds, nor is it within the meaning of the provisions of the law that regulate the manner of conveying real estate. The reason for the rule is that the parties do not undertake to acquire and to pass the title to real estate, as must be done by written contract or conveyance. They simply by agreement fix and determine the situation and location of the thing that they already own, the purpose being simply by something agreed on to identity their several holdings and to make certain that which they regarded as uncertain."

The judgment is affirmed.